# GILFILLAN *v.* McKEE.

# McPHERSON, EXECUTOR, *v.* McKEE.

APPEALS FROM THE SUPREME COURT OF THE DISTRICT OF COLUMBIA.

Nos. 26, 48.  Argued March 14, 15, 1895. — Decided October 21, 1895.

When a decree in chancery awards to a party in the suit a portion of a special fund, forming one of the matters in dispute therein, and denies to him the right to a part of a general fund, forming another and distinct matter in dispute, his acceptance of the awarded share in the special fund does not operate as a waiver of his right of appeal from so much of the decree as denies to him a share in the general fund.

Where a decree is several as to different defendants, and the interest represented by each is separate and distinct from that of the others, any party may appeal separately, to protect his own interests.

Some years before the commencement of the civil war, Cochrane, who had already acted as agent of the Choctaws in prosecuting their claims against the United States, contracted with them to continue to prosecute all their unsettled claims, and they contracted to pay him for such services thirty per cent of all sums collected through his efforts, when they should be paid by the United States. Under this contract he had collected a large amount when the war broke out, and the Choctaws sided with the South. On the termination of the war Latrobe was employed by the Choctaws in supporting such claims, and did valuable service. In 1866 Cochrane, being about to die, and desiring to secure pay for the services he had rendered, made a verbal arrangement for assigning the contract to Black, and by will authorized his executor to sell, assign or compromise his claims. He also recognized by his will that Lea was entitled to an interest in the contract equal to his own. This interest afterwards became vested in Gilfillan and his associates. Cochrane's executor, McPherson, agreed with Black for the continued prosecution of the claims on the terms named in the original contract, to which the Choctaws assented. Black and his partner, Lamon, and Lamon individually, continued acting under this contract until 1870, when the Choctaws made a new contract with McKee and his partner to prosecute their claims; and (the partner soon dying) this contract was executed by McKee. Under it the prosecutor was to receive thirty per cent of the amounts awarded, and it was provided that he should adjust the claims of all parties who had previously prosecuted claims for the Choctaws and should pay to the widow of Cochrane five per cent of the

thirty per cent.   In 1881 the question of the liability of the United States
on· these claims was referred to the Court of Claims and.a judgment was
rendered in favor of the Choctaws, which was substantially affirmed
by this court, 119 U. S. 1.   Congress then· made an appropriation of
$ 2,858,798.62 for the payment of· that judgment.   Before this appropri-
ation was made, and in view of it, the Choctaw council recognized the
contract with McKee, and another with Luce, as valid, and appropriated
thirty per cent of the amount to be -received from Congress under the
appropriation to their satisfaction.   The council also by the same· act
appropriated $ 14,140 as a sum shown to be due to Cochrane for services
performed by him in his lifetime.   After the passage of the appropria-
tion bill by Congress McKee drew from the Treasury twenty-five per cent
of the whole judgment, and Luce five per cent, the two making the thirty
per cent.   Suits in equity were then commenced against McKee by
Lamon, as surviving partner of Black & Lamon; by Gilfillan and others
interested with him; by· McPherson as executor of Cochrane; and by
Mrs. Latrobe as executrix of her husband; setting up their various
claims upon the fund.·   McKee filed a bill of interpleader in the Lamon·
case, and subsequent proceedings were had in the several suits as set
forth in detail in this and the following two cases.   They resulted in
decrees that one-half of the special fund should be paid to McPherson,
as executor of Cochrane, and the other half to Gilfillan and his associ-
ates; and that the general fund should be distributed to Cochrane's
widow, to Latrobe, and to Lamon, in specified proportions.   Lamon
was awarded $ 35,000 and interest for his services and disbursements,
and the claims of Lamon and Black, as assignees of the Cochrane con-
tract, and as surviving partners, were disallowed.   McPherson, as execu-
tor, appealed from so much of the decree as denied him participation in
the general. fund;   Gilfillan and others from the decree distributing the
general fund, and from a decree dismissing their cross-bill; McKee
from the decree giving a distributive share in the general fund to
Latrobe; and Lamon and Black from the decree disallowing their claim.
*Held*,

(1)  That McPherson had a right of appeal from the decree excluding
        him from participation in the distribution of the general· fund,
        although he had accepted payment of his share of the special fund;

(2)  That the sum awarded ·to Mrs. Cochrane by the Choctaws was in-
        tended as a donation to her, and not as compensation to Cochrane,
        and that the judgment of the court below to that effect should be
        sustained;

(3)  Further holdings were made in regard to the contentions in *McKee*
        v. *Lamon*, *post*, 317, and *McKee* v. *Latrobe*, *post*, 327, which will
        be found set forth in the head notes to those cases respectively.


THE litigation involved in this and the following cases was
originally instituted by a bill filed July 7, 1888, by Ward H.

Lamon and Chauncy F. Black, survivors of themselves and Jeremiah S. Black, (Black, Lamon & Co.,) against Henry E. McKee, the object of which was to protect and enforce their equitable rights and interest in an appropriation of $2,858,798.62, made by an act of Congress approved June 22, 1888, 25 Stat. 239, c. 503, to carry into effect the decision of this court in the case of the Choctaw Nation against the United States, relating to what is known as the Choctaw net proceeds claim. 119 U. S. 1. Six days after the filing of this bill by Lamon and Black another bill was filed, July 13, by John H. B. Latrobe, against Henry E. McKee and others, for the same general purpose of sharing in the sum recovered by McKee.

On July 19, McKee filed a bill of interpleader, which is the subject of the opinion in this case, against a large number of defendants, claiming, under eight or nine different titles, to share in the fund held by him, of which he admitted that they or some of them were entitled to the sum of $161,197.63, which he paid into court. This amount was made up of a general fund of $147,057.63, being five per cent of a commission of thirty per cent, which had been dedicated by the Choctaw Indians to the payment of attorneys and agents in the prosecution of their claims, and which had been received by McKee; and also of a special fund of $14,140, due to the estate of John T. Cochrane, for which a special appropriation had been made by an act of the general council of the Choctaw Nation of February 25, 1888, and which McKee had agreed to pay. The bill prayed that the defendants interplead, and that the court determine to whom the money should be paid.

On October 1, 1889, a decree of interpleader was entered, the defendants were enjoined from instituting or prosecuting any suit or action for the recovery of the money paid into the registry of the court by the complainant, and complainant was dismissed as a party to the suit, with his costs to be taxed. The decree, however, was made without prejudice to the rights of any of the defendants to institute any action at law or in equity, to recover from the complainant any de-

mands which they might have for amounts due from him over and above the money paid into court.

Answers and cross-bills were filed by the several defendants making claims to both funds, and upon a hearing upon pleadings and proofs one-half of the special fund of $14,140 was ordered to be paid to McPherson, executor of the will of John T. Cochrane, and the remaining half to the solicitors of James Gilfillan, John A. Rollings, and the estate of C. D. Maxwell. The general fund was ordered paid to Ellen Cochrane, widow of John T. Cochrane, John H. B. Latrobe, and Ward H. Lamon, in certain specified proportions. The claims asserted by certain other defendants, including a claim of McPherson, executor of Cochrane, to be paid out of the general fund for professional services rendered by Cochrane, was denied, and an appeal allowed in the decree. An appeal was also allowed to Gilfillan, Rollings, and Eastman, administratrix of the estate of C. D. Maxwell, from so much of the decree as awarded the general fund to Ellen Cochrane, John H. B. Latrobe, and Ward H. Lamon, and also from a decree previously rendered sustaining a demurrer to the cross-bill of Rollings, Gilfillan, and Maxwell, and dismissing the same. As to the last decree the appeal was dismissed.

Subsequently, as it appears from the certificate of the clerk, of March 1, 1895, the money deposited in court was paid out to the several persons to whom it had been awarded by the above decree.

The facts underlying all these cases were substantially as follows:

1. That the Choctaw Nation, having various unsettled claims against the United States, arising out of treaty stipulations, the principal of which was a claim for the net proceeds of certain lands, by resolutions of its legislative council, adopted November 9, 1853, and November 1, 1854, appointed certain citizens of that nation, the principal one of whom was one Pitchlynn, to prosecute such claims, and, in the name of the Choctaw people, "to enter into any and all contracts which in their judgment are or may become necessary and proper, to bring to a final and satisfactory adjustment and

settlement all claims and demands whatsoever, which the Choctaw Nation or any member thereof has against the government of the United States by treaty or otherwise."

2. Pursuant to this authority, on February 13, 1855, these delegates entered into a contract with John T. Cochrane, in which, after reciting the abandonment of a similar contract that had been made with Albert Pike, and the fact that Cochrane had already been for three years before acting as the agent of the Choctaw Nation in the prosecution of a claim for arrearages of annuities and school moneys, in which he had rendered valuable and most important services, Cochrane bound himself to continue to prosecute all unsettled claims and demands of the Choctaw Nation, and especially a claim arising under the treaty of Dancing Rabbit Creek of September 27, 1830, to the net proceeds of the lands ceded to the United States by that treaty, and to do his utmost to secure payment of said claims and demands, the Choctaws upon their part agreeing to pay him thirty per cent of every and all such sums of money, payable to them, as soon as the same was paid over by the United States.

3. Shortly thereafter Cochrane succeeded in inducing the authorities of the United States to enter into a treaty with the Choctaws, which was concluded June 22, 1855, 11 Stat. 611, by which it was agreed that the claim of the Choctaws for the net proceeds of the lands in question should be submitted for adjudication to the Senate, which body was thus charged with and assumed the functions of an umpire, and on the 9th of March, 1859, made an award in favor of the Choctaws, according to certain principles, and referred the matter to the Secretary of the Interior to state an account showing the amount due to them according to such principles. That official made his report to the Senate on May 8, 1860, certifying that there was due to the Choctaw Nation, under the award of the Senate, the sum of $2,981,247.30, and in 1861 there was paid to the Choctaws on account thereof the sum of $250,000.

4. No progress was made in the further prosecution of their claim from 1861 to 1866, by reason of the alliance of

the Choctaws with the Southern confederacy during the war. After the close of the war, however, Cochrane procured a treaty to be entered into between the United States and the Choctaw Nation, relieving them of their disabilities. 14 Stat. 769.

5. In 1866, Cochrane was stricken with a mortal illness, and with a view of securing to himself and family some remuneration for the services he had performed in behalf of the Choctaws, proposed to assign to Ward H. Lamon, or to some one in his behalf, all his interest in the contract of February 13, 1855; and verbal arrangements for the accomplishment of that result by the assignment of said contract to Jeremiah S. Black were made before the death of Cochrane. Before his death Cochrane made a will dividing his property equally between his wife Ellen and his sister Mary Magruder, and authorizing John D. McPherson, his executor, to sell, assign, or compromise his claims under his contract with the Choctaws as he should deem most for the interest of his estate. There was also an acknowledgment in this will that an equal interest in the Choctaw contract belonged to Luke Lea. After Cochrane's death, McPherson having qualified as his executor, a contract was entered into between him and Jeremiah S. Black, November 8, 1866, for the further prosecution of the Choctaw claims by Black, as the successor of Cochrane, and upon the terms of the contract made with Cochrane February 13, 1855, to which assignment the Choctaw delegates gave their assent.

6. The firm of Black, Lamon & Co., in whose behalf the assignment to Black was in fact made, at once entered upon and continued the work of prosecuting this claim until Judge Black withdrew from active practice, from which time the duty of prosecuting the claim devolved solely upon Lamon.

7. Nothing, however, was definitely accomplished before July 16, 1870, when, for reasons unnecessary to be here stated, the delegates of the Choctaw Nation entered into a new contract with James G. Blunt and Henry E. McKee to prosecute their claim, stipulating to pay them for their services and expenses thirty per cent of the sum already awarded and due to the Choctaw Nation, or of any sum that might be paid,

whenever the money or bonds arising from said claim should come into the possession of the party or parties authorized by the Choctaw people to receive the same. This contract contained a further stipulation of Blunt and McKee "to pay to Mrs. John T. Cochrane of Washington, D. C., five per centum from the thirty per centum before referred to whenever they shall receive the same; and the said Blunt and McKee further agree to adjust the claims of all parties who have rendered service heretofore in the prosecution of said claim upon the principle of equity and justice, according to the value of the services so rendered." Blunt soon afterwards died, leaving McKee to carry out the contract alone.

8. In 1881, an act was passed by Congress, 21 Stat. 504, c. 139, referring the question of the liability of the United States in respect to the Choctaw claims to the Court of Claims, and in March, 1886, a judgment was rendered in the Court of Claims in favor of the Choctaw Nation. 21 C. Cl. 59. From the judgment so rendered both parties appealed to this court, which also decided in favor of the Choctaws, and held that the award made by the Senate in 1859 determined the amount due in respect of the claim, 119 U. S. 1, and on June 29, 1888, an appropriation was made for the payment of the judgment of $2,858,798.62. 25 Stat. 217, 239, c. 503, § 9.

9. On February 25, 1888, an act of the legislative council of the Choctaw Nation, after reciting the recovery of the judgment, and that McKee and his associates were making proper efforts to secure from Congress an appropriation for the payment, enacted that the contract with McKee and another with one Luce should be recognized as valid, that the services required had been fully performed, and that to satisfy the obligations of the Choctaw Nation to McKee and Luce, who was jointly interested with him, there should be appropriated thirty per cent of the amount appropriated by Congress for the payment of the judgment, twenty-five per cent of which should be paid to McKee, and it was made the duty of the treasurer of the nation to make such payment. The fourth section enacted that "the sum of $14,140 shown to be due to the late John T. Cochrane, deceased, by an act of the

general council of November 1, 1861, is hereby appropriated
out of any money received from the United States in payment
of said judgment, and the payment of said amount shall be
made to said Henry E. McKee," etc.   The fifth section enacted
." that the payments herein directed to be made shall, when
made, either under this act, or said other two acts hereinbefore
referred to, be taken and accepted as full and complete pay-
ment and final discharge and satisfaction of all the contracts
and obligations of the Choctaw Nation to any and all attorneys
for services rendered to the nation in the prosecution of said
.claim against the United States."

10.  On the filing of the bill of complaint July 7, 1888, by the
surviving partners of Black, Lamon & Co. in the following
case, a preliminary restraining order was issued enjoining the
defendant McKee from demanding or receiving said money
from the Treasury.   But, in violation of this order, McKee,
on July 9, collected and received from the Treasury the sum
of $783,768.82, being the thirty per cent fund mentioned in
the Cochrane and McKee contract as set aside for the com-
pensation for services rendered in the prosecution of said
claim.   McKee, being subsequently ordered to pay into the
registry of the court the sum of $136,500 in the same case,
in addition to the sum of $161,197.63 paid into the court in.
this case, refused to obey the order, and to avoid doing so
absconded from the jurisdiction of the court, and has ever
since kept himself concealed to avoid process.

*Mr. John J. Weed* and *Mr. Jefferson Chandler* for McKee.

*Mr. S. S. Henkle* for Mrs. Cochrane ; *Mr. Enoch Totten*
and *Mr. Reginald Fendall* for Mrs. Latrobe ; and *Mr. James
Coleman* and *Mr. Nathaniel Wilson* for Lamon & Black sub-
mitted on their several briefs on the motion to dismiss.

*Mr. Totten* and *Mr. Fendall* for Mrs. Latrobe and *Mr.
Henkle* for Mrs. Cochrane, submitted on their briefs, on the
merits.

*Mr. A. B. Duvall* for Gilfillan submitted on his brief.

*Mr. Willis B. Smith* for Marbury, Administrator, submitted on his brief.

*Mr. George F. Appleby* and *Mr. Calderon Carlisle* for McPherson.

Mr. Justice Brown, after stating the case, delivered the opinion of the court.

A motion to dismiss the appeal of McPherson, made by the appellees, demands a preliminary consideration. This motion is made upon the ground, *first,* that the appellant is precluded from questioning the validity of the decree because, having been awarded a large sum of money out of the fund for distribution, he applied for and received the same, as did all the other beneficiaries to whom awards were made; and that the decree disposed of the entire fund and has been fully executed; *second,* that the decree was joint against the appellants and also against the other co-defendants, whereas the appellants appeal separately and alone, their co-defendants not joining, and without any proceeding in the nature of a summons and severance.

1. It did undoubtedly appear from the certificate of the clerk above mentioned that McPherson was paid $7070 of the amount decreed to him out of the special fund. But it further appeared that he claimed to be paid from the general fund of $147,057.63, and that his claim in that particular was denied. While the acceptance of the whole or a part of a particular amount awarded to a defendant might perhaps operate to estop him from insisting upon an appeal, there were practically two decrees in this case, one applicable to the special fund, which, in the bill, the subsequent pleadings, and in the decree, had been kept as a distinct and separate matter, a portion of which fund was awarded to McPherson; and the other applicable to the general fund in which McPherson had been denied any participation whatever. Clearly his acceptance of a share in the special fund did not operate as a waiver of his appeal from the other part of the decree disposing of the general fund. There is nothing inconsistent in his action

in accepting the amount awarded to him from the special fund, and appealing from the refusal of the court to award him the general fund. As was said by this court in *Embry* v. *Palmer*, 107 U. S. 3, 8: "No waiver or release of errors, operating as a bar to the further prosecution of an appeal or writ of error, can be implied except from conduct which is inconsistent with the claim of a right to reverse the judgment or decree which it is sought to bring into review. If the release is not expressed, it can arise only upon the principle of an estoppel. The present is not such a case. The amount awarded, paid, and accepted constitutes no part of what is in controversy. Its acceptance by the plaintiff in error cannot be construed into an admission that the decree he seeks to reverse is not erroneous."

2. The objection that an appeal was not taken by the other defendants; that they did not join in the appeal, and that there was nothing in the nature of a summons and severance, is equally untenable. The decree was several, both in form and substance, and the interest represented by each defendant was separate and distinct from that of the other. In such cases any party may appeal separately to protect his own interest. *Cox* v. *United States*, 6 Pet. 172; *Todd* v. *Daniel*, 16 Pet. 521; *Hanrick* v. *Patrick*, 119 U. S. 156; *City Bank* v. *Hunter*, 129 U. S. 557, 578.

3. As to the merits, we are only concerned in this case with the general fund of $147,057.63, which is five per cent upon the thirty per cent which the Choctaws agreed to pay to McKee for his services. This fund was awarded by the final decree to Ellen Cochrane, individually, and to Latrobe and Lamon, the fund being divided into $257\frac{57}{100}$ parts, of which Latrobe took 75, Lamon 35, and Ellen Cochrane the residue. The parts assigned to Latrobe and Lamon represent the decree obtained by them upon their separate bills against McKee in the two following cases. Both McPherson as executor of Cochrane, and Rollings and Gilfillan, assignees of Lea, appealed from the decree in the present case. The interests of these appellants are in reality identical. Cochrane, in his will, made in 1866, acknowledged an equal interest in the Choctaw

contract to belong to Colonel Luke Lea, and on September 24, 1869, Lea assigned all his interest to Rollings and Gilfillan. No controversy exists between these parties; but if McPherson be awarded the fund, both are interested to defeat the claims of Latrobe and Lamon, which diminish by the amount of their decrees the sums which would otherwise go.to the Cochrane estate. Both are also interested adversely to Ellen Cochrane, who claims the entire fund individually, while the appellants claim it as assets of Cochrane's estate to pass under his will, one-half to Rollings and Gilfillan, assignees, and the other half to be divided equally between Ellen Cochrane, his wife, and Mary Magruder, his sister.

The controversy between them turns upon the construction of the contract of July 16, 1870, between McKee and the Choctaws, in which Blunt and McKee agreed " to pay to Mrs. John T. Cochrane of Washington city, D. C., five per centum from the thirty per centum before referred to whenever they shall receive the same." The view of the court below was that, if there were a trust in favor of parties who had rendered valuable services before the execution of the McKee contract of July 16, 1870, that trust attached to every dollar received by McKee, and that it was not in his power to disengage any particular dollar or any particular sum of money from the charge, and hence that the amount paid into court by McKee in this case was subject to the trust found by the court to exist in the other cases in favor of Latrobe and Lamon. As the court also awarded the residue to Ellen Cochrane, it follows that it must have treated this as a donation to Mrs. Cochrane and not as a payment for services rendered by Cochrane, as, under the latter theory, it would have been ordered paid to McPherson, as executor, to become a part of the assets of his estate.

Two questions then arise upon this appeal. First, was the payment in the McKee contract to be made to Mrs. Cochrane intended as a personal gift to her, or as a payment for Cochrane's services ? Second, was such sum subject to a trust in favor of Latrobe and Lamon?

In disposing of the *first* question it is only necessary to

consider the contract between the Choctaws and McKee, in which the former agreed that for services rendered and money expended and to be expended in the prosecution of the claim, Blunt and McKee should receive thirty per cent of the amount awarded, or of any sum that may be paid by the United States, Blunt and McKee on their part agreeing to pay five per cent of this thirty per cent to Mrs. Cochrane, and also to adjust the claims of all parties who have rendered service heretofore in the prosecution of said claim, upon the principle of equity and justice, according to the value of the services so rendered. By section 4 of the act of the Choctaw council of February 25, 1888, the sum of $14,140 was the amount fixed as due the late John T. Cochrane, deceased, by an act of the general council of November 1, 1861, and that sum was appropriated out of any money to be received from the United States in payment of said judgment. Exactly for what this was intended as a payment does not clearly appear, but the fact that it was found to be due by an act passed in 1861 indicates very clearly that it could not have been for services subsequently rendered, although section 5 provides that the payments therein directed to be made should be accepted as full discharge and satisfaction of all the contracts and obligations of the Choctaw Nation to any and all attorneys for services rendered to the nation in the prosecution of said claim. This appropriation was evidently intended to discharge that obligation to him personally.

The argument for Mrs. Cochrane is based upon this plain agreement on McKee's part to pay her the five per cent, although, as no consideration moved from her either to McKee or to the Choctaws, it is in reality a donation. Upon the contrary, the appellants insist that the payment was intended as compensation for the services of Cochrane, which had been undoubtedly of great value to the Choctaws, and that the nation had no right to divert what must naturally have been intended as a payment for those services away from his estate, to which it properly belonged, and turn it into a donation to his widow. The oral testimony as to the intention of the parties, if competent at all, is conflicting and wholly unsatisfactory.

As already observed, the Cochrane contract provided for payment to him of thirty per cent of the amount collected, but it was a contract wholly contingent upon his success, and was never performed either by Cochrane personally, or by Black and Lamon, his assignees. Nothing was ever earned by them under this contract, and neither Cochrane's executor nor his assignee ever stood in position to sue upon it, or to claim anything by virtue of it. At the same time, both the Choctaws and McKee were ready to concede that Cochrane had rendered valuable services, which had doubtless contributed much to the ultimate success of the venture, and were, therefore, willing that compensation should be made in some form. Under the circumstances, there was nothing unreasonable in providing that this compensation should take the shape of a personal gift to Mrs. Cochrane, and thus relieve the estate from litigation with a horde of other claimants, who might be expected to appear and claim to have rendered services to Cochrane, for which they were equitably entitled to share in the compensation. The oral testimony indicates that the insertion of Mrs. Cochrane's name instead of the executor of her husband's estate was an idea of Pitchlynn's, the chairman of the delegation, who thought that such a provision would prevent the necessity of the fund going through the probate court. In this connection McKee also states that the provision was put in at the instance of Pitchlynn, who stated that he considered the death of Cochrane ended his contract, and his right to any further compensation for his services in the prosecution of the claim, but he was determined to make some provision which would not be subject to the control of Cochrane's executor or subject to his creditors, but that it should be paid directly to her, to be held and enjoyed by her in her own right; and hence that Pitchlynn insisted upon the provision in the contract in favor of Mrs. Cochrane, and the contract on the face of it expressed exactly what was intended by the contracting parties at the time. Had Cochrane or his assigns earned anything under this contract, and the promise had been to pay money earned for services fully performed, a question might have arisen as to

the power of the Choctaws or of McKee to divert it from the estate in favor of the widow, but as the obligation, if any existed at all, was only a moral one, the parties had a right to discharge it in their own way.

This construction is consonant with the language of the act of the Choctaw council appropriating $14,140 in payment of the amount due to the estate of Cochrane, and providing that such payment should be a final discharge and satisfaction of their obligation to him personally. Upon the whole, we think the court construed this provision of the contract correctly.

As Mrs. Cochrane did not appeal from that part of the decree admitting Latrobe and Lamon to share with her, and as the appeal of the other parties turns primarily upon the validity of the allowance to Mrs. Cochrane, and not upon the fact that Lamon and Latrobe were admitted to share in such allowance, it is unnecessary to consider the second question. If the amount decreed to them were reduced, such reduction would redound to Mrs. Cochrane's benefit and not to the appellants.

While, as before observed, we think the court made a correct disposition of the case so far as this appeal is concerned, the reversal of the following case may make it necessary to readjust the amount due to Lamon and Black, and consequently

*Our decree in this case must be for a reversal to await the disposition of the following case, and for further proceedings in conformity with this opinion.*