## THE JEAN L. SOMERVILLE.

(Circuit Court of Appeals, Fifth Circuit. December 19, 1922. Rehearing Denied January 13, 1923.)

### No. 3889.

1. **Admiralty ☜106—Parties not affected by appeal need not be joined.**

    Where a suit for salvage was brought by the United States, as owner of the salving vessel, on behalf of itself and the officers and crew, and a separate award was made to the officers and crew, which was paid to and accepted by them, they need not be joined or severed in an appeal by libelant.

2. **Salvage ☜21—Demanding bond held not to forfeit right to salvage.**

    That the representative of the United States refused to permit a salved vessel to leave the port to which she had been brought by a government vessel until she gave a bond for payment of salvage *held* not to forfeit the right to salvage, where no delay in the movement of the vessel resulted.

3. **Salvage ☜13—Towage of schooner in distress to port held salvage service.**

    A steamship of large value, with full cargo, which interrupted her voyage to tow a schooner in distress to port, though the schooner was in no immediate danger, *held* entitled to salvage, including payment for the time lost.

Appeal from the District Court of the United States for the Southern District of Alabama; Robert T. Ervin, Judge.

Suit in admiralty by the United States against the American Schooner Jean L. Somerville; J. Wilson Somerville, claimant. From the decree, the United States appeals. Reversed and remanded.

J. Frank Staley, Sp. Asst. Atty. Gen., and Jos. W. John, Asst. U. S. Atty., of Mobile, Ala. (Aubrey Boyles, U. S. Atty., of Mobile, Ala., on the brief), for the United States.

Palmer Pillans, of Mobile, Ala. (Pillans & Gresham, of Mobile, Ala., on the brief), for appellee.

Before WALKER, BRYAN, and KING, Circuit Judges.

☜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

KING, Circuit Judge. About 11 o'clock a. m. on December 29, 1919, the schooner Jean L. Somerville, on her voyage from Las Palmas, in the Canary Islands, to Mobile, Ala., was sighted by the steamship Moosehausic, a vessel belonging to the United States, controlled by the United States Shipping Board Emergency Fleet Corporation, which, with a full cargo, was on her way to London, England. The schooner had spoken a United Fruit Company's steamship some days before, and shipping had been notified by wireless that the schooner was in the Gulf in a condition of distress. The schooner, when sighted by the Moosehausic, was about 65 miles from Pensacola, the nearest port, and was flying a signal of distress. Her captain had died two days before. His dead body was on board. The first mate had left the schooner some time before. The captain's wife was on the schooner, and was the only person on board able to navigate her. The master of the steamship, after speaking the schooner, sent a wireless message to his agents at Pensacola, stating that he had found the schooner Jean L. Somerville, was standing by her, and asking instructions.

Before a reply could be received to this message, the bowsprit of the schooner fouled the main topmast back stay of the steamship, breaking about 12 feet off her topmast, and putting her wireless equipment temporarily out of commission. The steamship, which had left Pensacola early that morning, took the schooner in tow and at 11:30 a. m. started with her for Pensacola. The master of the steamship was under the belief that there was no navigator on board the schooner. The wind was a head wind for a sailing vessel bound for Pensacola or Mobile, and while there is some conflict as to whether a direct request was made for towage, it is not disputed that this service was desired by those in charge of the schooner and accepted without objection.

After the towing had proceeded for 5 or 6 hours, when the vessels were about 20 miles from Pensacola, a reply was received by the steamship to her wireless message, directing her to give sailing directions for Mobile to the schooner and to proceed on her own voyage. The master replied that he was then so near in shore that he would take the schooner to Pensacola, and received a reply from his agents acquiescing in that course. About 10:15 p. m., the steamship, with the schooner in tow, reached the bell buoy at the Pensacola bar, and the schooner was anchored in seven fathoms of water; the steamship standing by during the night. The master of the steamship and her supercargo went up to the city and spent the night there. The steamship sailed the next day (December 30th) about 3 p. m., and reached the point on her course for London, from which she had towed the schooner, in from 5 to 6 hours.

The agents of the United States Shipping Board refused to permit the schooner to proceed on her voyage to Mobile from Pensacola until she should give bond in the sum of $20,000 to secure the United States in any sum which might be due because of the services of the steamship to the schooner. Such bond was given by 4 o'clock on the afternoon of the 30th. The steamship was worth approximately $1,000,000 and had on board a full cargo. The schooner was worth about $105,000. She was light.

A libel was filed by the United States, in behalf of itself and the officers and crew of the steamship, claiming salvage in the amount of $7,500 for said services. The schooner was claimed by its owner, J. Wilson Somerville, and a claim bond given in the sum of $10,000.

The court found that the libelant was entitled to recover, and fixed as a reward for services the sum of $1,000, and in addition a charge for the use of the ship's time, for the period of 10 hours, of $580, a total of $1,580. He reduced this sum by $554.61, the damage to the schooner by the breaking and carrying away of her jibboom in the fouling thereof, which he adjudged was due to the steamship's negligent navigation, thus reducing the amount awarded to $1,025.39. Of this sum he adjudged one-third was due to the officers and crew; their award being subsequently fixed by decree at $500. As to the share of the award apportioned to the ship, he adjudged that the owners had, by the misconduct of their officers, servants, and agents, forfeited all right to such share, and should recover nothing. The sum awarded to the officers and crew has been paid to, and accepted by, them.

The United States has appealed from the decree holding that they should recover nothing. The misconduct set up in claimant's answer is: (1) The towage of the vessel, instead of giving her sailing directions for Mobile bar; (2) anchoring the vessel at the sea buoy, instead of bringing her into the harbor of Pensacola; (3) requiring the giving of a $20,000 bond before surrendering the vessel to the owner.

The appellant assigns error in the decree of the District Court in holding that the owners of the vessel had forfeited all right to compensation by reason of misconduct; also that the amount awarded was too small, and that the court should not have held the libelant chargeable with the damage to the schooner caused by the breaking of her jibboom. A motion was made to dismiss the appeal, because the same was taken alone by the United States; the officers and crew not being made parties, and no summons and severance having been made.

[1] 1. We do not think the motion is well taken. In the first place, the libel is filed by the United States alone, which sues on behalf of itself and on behalf of the officers and crew. The answer of the claimant is stated to be his answer "to the libel of the United States of America"; his claim bond is given to the United States alone. But, even if the officers and crew were such parties that they could have appealed, the decree adjudged a separate sum in their favor, which has been paid to, and accepted by, them, and they thereafter had no interest in the litigation, and were not parties to, or interested in, its further progress. Gilfillan v. McKee, 159 U. S. 303, 312, 16 Sup. Ct. 6, 40 L. Ed. 161. The United States was therefore the proper party, and could be the only party, entitled to prosecute this appeal. The Blackwall, 10 Wall. 1, 19 L. Ed. 870.

2. We think that the court was in error in holding that the owners of the steamship had forfeited all right to compensation by reason of misconduct. As to the failure to bring the schooner inside of the harbor, arriving at the bar about 10 o'clock at night, there was no misconduct in the action of the steamship anchoring the schooner where she

did, and standing by her during the night, where she could have rendered her aid, had it been required.

Nor was there any misconduct shown on the part of the steamship in not towing the schooner up to the city of Pensacola. The only complaint made by her owner was that the schooner was not permitted to be towed to Mobile, until the bond required was given. Not only was no objection made by the representatives of the steamship to the removal of the body of the dead captain, but the record shows that it was not desired to remove him from the schooner, as this would have subjected the schooner to delay from quarantine regulations.

[2] As to the requirement of a bond, the objection made was to the giving of any bond, it being urged that the schooner could as well be libeled on reaching Mobile. No objection appears to have been urged to the amount of bond demanded. Had the officials of the Shipping Board consented to defer requiring a bond until the schooner reached Mobile, they would have taken the risk of her loss on the way to Mobile. Again, they had the right to have libeled her in Pensacola, and thus have detained her there until a bond was given for her release. As it was, the bond demanded was given by 4 o'clock of the afternoon of the day when demanded. The schooner was towed to Mobile on the day following.

We do not think that, even if the amount of the bond demanded was too large, the demand therefor, as a condition to consenting to her proceeding on her voyage to Mobile, was such misconduct as would forfeit the right to compensation for the services rendered. No delay in what would otherwise have been the movement of the schooner is shown by the evidence. The bond was made with reasonable promptness by a surety company for a premium of $200. If it be assumed that only $10,000 would have been required, had the libel, afterwards brought, been filed on the morning of the day when the bond was required, the premium for the additional amount could not have exceeded $100.

We therefore conclude that a deduction from the amount awarded of $100 for such additional premium was all that the District Judge should have required of the owner, and that a forfeiture of all compensation should not have been decreed. The Apache (C. C.) 124 Fed. 905, 915; Barge No. 127 (D. C.) 113 Fed. 529.

3. We agree with the court below that the damage to the schooner from the breaking of her jibboom was properly deducted from the amount awarded to the libelant. Before any such damage occurred, the schooner had lowered her sails in compliance with the direction of the steamship. The movement of the vessels in regard to each other was wholly in the control of the steamship.

No excuse is suggested for such proximity of the steamer to the schooner as would render such fouling an accident not avoidable by the exercise of proper care. The master of the steamship admits that the fault was his. We think, therefore, the steamship was liable for the damage resulting therefrom. Of course, it follows that the schooner was not responsible for any damage happening by reason of such accident to the steamship's wireless equipment or topmast.

[3] 4. As to the award made to the owners for compensation, we think, under the circumstances of this case, the case was one in which the libelant was entitled to salvage, although salvage of a low order. Here a vessel of large value, not engaged in the towage business, interrupted her voyage, while carrying a full cargo, to tow a vessel in distress to the nearest port. True, it may be that the vessel was in no imminent, or even probable, danger of shipwreck. Still the circumstances surrounding her made her a vessel who should be deemed a vessel in distress. The District Judge awarded as the compensation for services rendered by the steamship the sum of $1,000. We do not feel called on to disturb this finding.

In addition, the District Court held that the value of the ship's time, by which her voyage was prolonged, should be added, and decided that time to be 10 hours. We think this allowance of time is too short. The time consumed from the hour when the steamship spoke the schooner to the time she anchored at the bell buoy at the Pensacola bar was about 11 hours. The steamship was not required to abandon the schooner at night, at the bar, and at once resume her voyage. She properly remained within call, at least until the schooner was in reach of other assistance, and until the steamship could communicate with her representatives. The master communicated with such representative at 8:30 a. m. the next morning, and allowing an hour and a half to return to the ship, which the evidence indicates is the time required, the earliest time at which the steamer could have been expected to sail was 10 o'clock, about 12 hours after she reached the bell buoy the night before. The testimony is that it took her about 6 hours to reach the point on her course to London from which she was diverted by her towing of the schooner. It would seem that 29 hours, at least, of her time, is fairly chargeable to the schooner. It is stipulated that the value for each 24-hour period of the steamship Moosehausic was $1,400. This would make the value of 29 hours of her time $1,690, which, added to the $1,000 compensation awarded, makes her entitled to $2,690. Deducting therefrom the $554.61 for damage, because of carrying away the jibboom, the $500 already paid to the officers and crew, and the $100 additional premium on the $20,000 bond, leaves a net sum of $1,535.39, for which a decree should be rendered in favor of the owners of the steamship Moosehausic.

The decree of the District Court is reversed, and the cause remanded for further proceedings in conformity to this opinion.

Reversed and remanded.