## THE CITY OF PORTLAND.

### LAFAYETTE SHIPPING CORPORATION et al. v. RICHARDS et al.

(Circuit Court of Appeals, Fifth Circuit. March 5, 1924. Rehearing Denied April 1, 1924.)

#### No. 4246.

1. Salvage ⚍13—Towing tugs are entitled to salvage compensation for extraordinary service rendered in saving tow.

Service rendered by towing tugs in saving their tow, which became endangered during the towing without their fault, was an extraordinary service, not within the contract, and for which they are entitled to salvage compensation, though much less than would by a proper allowance to an independent salvor.

2. Salvage ⚍34—Award to tugs for salvaging their tow.

While a motor schooner was being towed by two tugs a few miles up the river at New Orleans for loading cargo, one of her motor shafts, which was not connected up, dropped out, leaving an opening through which the water entered, from which she was in danger of sinking, and the tugs, with the help of another of the same owner, towed her down river six miles and beached her, and after the leak was stopped pumped her out, the entire service of the three tugs aggregating 70 hours. The schooner was worth $300,000. *Held* that, under the circumstances, the tugs and crews were entitled to a salvage award of $6,000.

Appeal from the District Court of the United States for the Eastern District of Louisiana; Rufus E. Foster, Judge.

Suit in admiralty for salvage by F. J. Richards, master, and others against the motor Schooner City of Portland, the Lafayette Shipping Corporation, claimant, and others. Decree for libelants, and claimant and others appeal. Reversed, with direction to modify.

George H. Terriberry, Frazer L. Rice, W. W. Young, Jos. M. Rault, and Walter Carroll, all of New Orleans, La., for appellants.

Gustave Lemle, Arthur A. Moreno, Selim B. Lemle, Richard B. Montgomery, John D. Grace, and M. A. Grace, all of New Orleans, La. (Louis G. Lemle and Edwin H. Grace, both of New Orleans, La., on the brief), for appellees.

Before WALKER and BRYAN, Circuit Judges, and SIBLEY, District Judge.

⚍For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

BRYAN, Circuit Judge. The District Court, in proceedings in rem for salvage, entered a decree for $15,000 against the motor schooner City of Portland. The owner of the schooner appeals, on the ground that the decree is excessive.

The City of Portland was a wooden, auxiliary, twinscrew, five-mast schooner, 276 feet long, 48 feet beam, of a gross tonnage of 1,612 tons, and of the value of $300,000. On May 23, 1920, she was at the docks of the Johnson Iron Works in the Mississippi river at New Orleans, and had been undergoing repairs. New propellor shafts had been installed, but had not been coupled up to the engines, and were held in place by clamps. Her master employed W. G. Coyle & Co. to tow the schooner several miles up the river for the purpose of taking on cargo. Coyle & Co. sent their tug Ella Andrews, and also the tug W. C. Wilmot, owned by the River & Ocean Towing Company, to perform the towage service. These tugs arrived at 9 o'clock in the morning, and about 9:30 pulled the City of Portland away from the dock, and then made fast to her, one on the port and the other on the starboard side. At about 9:50, as they started upstream, the port propeller shaft of the schooner dropped out, and water began to enter through the stern tube or opening, which was 8½ inches in diameter, and 6 or 7 feet below the water line. The engineer of the schooner placed a piece of timber 4x6 inches in the opening, but was able to hold it there for a few minutes only. The tugs turned the schooner around and started down the river, at the same time calling to their assistance the tug Corona, also owned by the River & Ocean Towing Company. The master of the schooner suggested putting her aground at Algiers Point, which was near by; but the master of the Ella Andrews advised him that was an unsafe place, on account of sunken wreckage and débris of various kinds. The schooner was then towed by the three tugs to the Chalmette flats, a distance of about 6 miles, and at 11 o'clock was there put aground on a soft, sandy, and sloping bank. The crew of the vessel dropped her port anchor and 45 fathoms of chain. Two 7-inch manilla lines, belonging to the schooner, were run ashore and made fast to trees.

As soon as the water began coming into the schooner, she began operating her pump by her own steam, and this was continued after she was beached, and until some time in the afternoon, when the water rose high enough to reach the donkey boiler, which was 8 or 9 feet above the bottom of the engine room. Shortly after the schooner was beached, two of the tugs began to syphon the water out, and the other went to secure a diver, who made an unsuccessful effort to close the opening, either because of the pressure of the inflowing water or the current of the river. At 6 o'clock, after much consultation and exchange of opinions, it was decided to allow the vessel to fill up level with the water outside, so as to relieve the pressure. This was done, and by 8 o'clock the diver had closed the opening. During this period of two hours the water in the hold of the vessel rose from 10 to 14 feet. The tugs again began to pump and syphon out the water, and completed that task by 4 o'clock the next morning. At about 11 o'clock two of the tugs pulled the schooner off without difficulty, and later delivered her back to the docks of the Johnson Iron Works.

There is considerable conflict in the testimony as to the depth of water in the hold of the schooner before and at the time she was beached. The master of the Ella Andrews estimated that at the time she was beached it was 10 feet at the stern, and practically nothing at the bow, which would be accounted for in large measure by the fact that the river was much shallower at the bow. His testimony would therefore indicate that there was an average depth of not exceeding 5 feet. The master of the schooner testified that at this time there was not more than an average depth of 1 foot. The ship pumped a 6-inch stream, and in view of the fact that the depth was increased only 4 feet during the two hours when there was no pumping, it is fair to assume that the average depth at the time the schooner was grounded did not exceed 2 feet. The schooner's machinery weighed about 15 tons, and witnesses for the libelants testified that without assistance the schooner would have sunk. The time consumed by the tugs is as follows: The Ella Andrews, 28 hours; the Wilmot, 23 hours; the Corona, 19 hours— or a total of 70 hours. The values of the tugs are not satisfactorily shown, but for towage service the one first named usually received $25 to $30 per hour, and each of the other two $30 to $35 per hour.

The original libel was filed by the crew of the Ella Andrews, and intervening libels were filed by the Ella Andrews and by the other two tugs and their crews. The diver's claim is not involved. The decree apportions 40 per cent. of the award of $15,000 to the owner of the Ella Andrews and her crew, 60 per cent. to the owners of the other two tugs and their crews, and this apportionment is not questioned. In the division between the owner and crew of each tug, the crew of the Ella Andrews were allowed pay for 20 days, with a special award of $100 to her master; the crew of the Wilmot for 10 days, and that of the Corona for 5 days.

The libelants acted promptly, and displayed skill and good judgment in beaching the schooner. It is quite probable that the vessel would have sunk on account of the weight of the machinery. At least the salvors were justified in entertaining the belief that she would. If, as contended by the appellant the schooner would only have become waterlogged, she might have been injured by passing vessels, and in any event would have stood in need of assistance.

[1] The appellant concedes that an award for salvage should be made, but contends that the Ella Andrews and the Wilmot should be compensated only upon a towage basis for towing and beaching the schooner, and are entitled to salvage only for the services thereafter rendered. The argument in support of this contention is that these two tugs, because of the towage contract, were under obligation to save the schooner when she became imperiled, and were not at liberty to abandon her until all reasonable efforts had been exhausted. The conclusion is sought to be drawn that the Ella Andrews and the Wilmot were not in position to render salvage service, because such service must be voluntary. The towage contract contemplated that the tow should bear all risks, except those caused by the fault of the tugs. A difference is to be noted between towage at sea, where it is necessary to take into consideration dangers arising from wind and weather,

and towage in a protected harbor. It is admitted that the English rule permits a towage service to be converted into a salvage service. But salvage in England, as well as in this country, must be voluntary. Yet here, as well as there, a towage service may be converted into a salvage service. In The Connemara, 108 U. S. 352, 2 Sup. Ct. 754, 27 L. Ed. 751, where a fire aboard the tow during the period covered by the towage contract was extinguished by the crew of the tug, it is said:

"The contract of the towboat and her officers and crew was to tow the ship, and did not include the rendering of any salvage service, by putting out fire or otherwise. Such a service, which, by the use of the steam pump and engine of the towboat, rescued the ship from an unforeseen and extraordinary peril, gave the owner as well as the officers and crew of the towboat a right to salvage."

Among other English cases there cited with approval on this point is The Minnehaha, 15 Moore, P. C. 133, in which it is said:

"But if, in the discharge of this task, by sudden violence of wind or waves, or other accidents, the ship in tow is placed in danger, and the towing vessel incurs risks and performs duties which were not within the scope of her original engagement, she is entitled to additional remuneration for additional services if the ship be saved, and may claim as a salvor, instead of being restricted to the sum stipulated to be paid for mere towage."

In The City of Haverhill (D. C.) 66 Fed. 159, what appears to us to be the true rule is thus admirably stated by Judge Addison Brown:

"This was an extraordinary service, because not within the scope or contemplation of the contract. It should therefore be compensated for on salvage principles. But the equitable relation of the parties in such cases, where the tow is all the time in charge of the tug, requires, I think, the allowance of a much less compensation than would be proper to be given to an independent tug."

We do not understand a different rule is announced, as the appellant claims, in The Joseph F. Clinton, 250 Fed. 977, 163 C. C. A. 227, where it is held that a tug cannot make a claim for salvage until the obligation of the towage contract has been fulfilled, or "the service claimed for is shown to be outside of and beyond the same." In the other cases appellant cites, the suits were against the tugs, and no question of salvage was involved. We are of opinion, therefore, that the Ella Andrews and the Wilmot were rendering salvage service from the time the propellor shaft dropped out of the City of Portland, but that they should not receive as great an award as would be allowed to an independent tug.

[2] What is a reasonable salvage award is always a question of difficulty, upon which reasonable minds reach widely different conclusions. For this reason the decrees of trial courts should not be set aside lightly, or at all unless they are greatly excessive or inadequate. Fully recognizing this principle, we think the decree of the District Judge in this case is greatly in excess of an adequate award. Where a salvaged vessel was in danger only from possible, but undisclosed, perils of the sea, the allowance in this circuit to a salvaging tug usually has been fixed at double the towage rate. The Catalina, 105 Fed. 633, 44 C. C. A. 638; The Jean Somerville (C. C. A.) 286 Fed. 35; Magnolia Petroleum Co. v. National Oil Transport Co. (C. C. A.) 286 Fed. 40. The

City of Portland was in more danger than characterized the class of cases to which reference has just been made, in that without prompt assistance she probably would have sunk. But in the circumstances which surrounded her she was not in great danger. The tugs which had hold of her could easily have saved her, as they did. Besides, she was in a great port, where other assistance was readily available. We are not impressed, as the District Judge was not, that the life of any member of the several crews was in serious peril. The tugs were lashed to the schooner, but the master of one of them was on board the latter and could have given any necessary warning, and at no time while the schooner was being towed was there enough water in her hold to make it probable either that she would capsize or sink. After the vessel was beached, she was firmly aground, and securely held in position, and no sense of danger seems to have been warranted or entertained by any one while she was being pumped out.

The appellees specially rely upon the decision of this court in The George Hawley, 242 Fed. 473, 155 C. C. A. 249, as authority to sustain the decree of the District Court. In that case the services were held to be reasonably worth $7,000, and it was questionable whether the venture would be successful. In the instant case success was reasonably certain, and the expenditure much less. On a quantum meruit basis the services rendered were worth about $2,000. To this we conclude, and hold, that $4,000 should be added as a reward under well-established principles, thus making a total salvage award of $6,000. The apportionment, as between the three tugs and their crews, made by the District Judge, is not contested, appears to be fair, and is approved, as is also the allowance therein made to the crews of the respective tugs. The crew of the Ella Andrews, who were awarded a total of $639.94, did not appeal, but have petitioned for an increase of the award made to them. We think the allowance of the District Judge was ample, and particularly so since the amount of the decree has been so much reduced.

The decree is reversed, with directions to enter a decree in conformity with this opinion.