## THE SOUTH AMERICAN.

District Court, S. D. Georgia.   March 10, 1927.

**I. Salvage ⊕⇒7—Warning to change course, preventing stranding, held a "salvage service."**

Warning to change her course, given by a tug to a steamship which heavily listed by shifting of cargo was attempting to enter Savannah river at night, which warning was heeded and saved the ship from stranding and probable total loss, *held* a "salvage service."

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Salvage Service.]

**2. Salvage ⊕⇒27—Tug held entitled to $5,000 for convoy, docking, standing by, and salvage services preventing stranding and probable total loss of steamship valued $55,824.60, with cargo valued $83,372.68.**

Where value of heavily listed steamship was $55,824.60, and her cargo $83,372.68, and freight collected was $11,604.30, about two-thirds of which had been earned, *held* that tug valued at $60,000 was entitled to $5,000 for services in convoying, docking, standing by, and salvage, taking less than 24 hours, preventing stranding and probable total loss of steamship; danger to tug, though not very great, not being entirely absent.

In Admiralty. Suit for salvage by the Atlantic Towing Company against the steamship South American. Decree for libelant.

Lawton & Cunningham, of Savannah, Ga., for libelant.

Bigham, Englar & Jones, of New York City, and Anderson, Cann & Cann, of Savannah, Ga., for libelee.

BARRETT, District Judge. On September 26, 1923, the steamship South American was en route from Cuba to New Jersey, laden with copper ore. The cargo shifted so that the vessel came to list some 20 to 22 degrees. The efforts of the crew to correct the shifting proving unavailing, the captain determined to seek the port of Savannah. The circumstances leading to the knowledge on the part of the Atlantic Towing Company that the vessel was in this condition and seeking such port are unimportant in this case. Its tug went to the mouth of the Savannah river seeking the South American, with the possibility that the steamship might need the tug's assistance, but without any previous knowledge to that effect or contract covering the tug's trip to the ocean. The captain of the steamship had charts of the entrance to the Savannah river and had been there twice before, but each time a pilot was used by him. The steamship had gone four miles or more

north of the entrance to the river, and, while making toward the shore, passed the black buoy off Gaskins bank. The sea buoy marking the entrance to the Savannah river is approximately southwest by south from the black buoy off Gaskins bank. Between the sea buoy and the next buoy up the Savannah river is about two miles, about north northwest. To the northwest of this latter buoy, and north of the channel into the river, is shallow water, through which is the north channel marked by an unlighted buoy. This channel is not of sufficient depth to accommodate the steamship South American.

There are conflicts in the testimony as to the force of the wind and waves and as to the course of the steamship after passing the buoy off Gaskins bank. The wind and waves were sufficiently strong and high to induce the captain of the steamship to maintain his course so that the wind and waves would be astern, and the course of the vessel was toward this north channel until its course was altered after the warning from the tugboat captain. The tugboat approached the vessel when on its course from Gaskins bank toward the north channel, and proffered a tow twice, which was declined both times. Soundings were taken by the tugboat after it had dropped behind the steamship. The tugboat then overtook the steamship and hailed the captain and told him that he was approaching shoal water and should make for the Nordlys, a lighted ship at anchor beyond the sea buoy. The vessel's helm was immediately changed in accord with the warning, and the course was then taken toward the Nordlys. The angle between the course upon which the steamship was and its course after changing is estimated in one case at 50 degrees and another at 90 degrees. The list of the ship was to the port side, and the altered course necessitated the exposure of the listed side to the wind and waves from the northeast. The tug accompanied the vessel on the sea side, claiming to thereby furnish some protection against wind and waves, the efficiency of which protection the captain of the steamship denied. The steamship went beyond the sea buoy and thence up the river to Savannah, about 20 miles, being convoyed by the tug up the river at the request of the captain of the steamship. A pilot was taken aboard by the steamship, and the tug assisted in docking the steamship and stayed by until the next morning. The first contact between the tug and the steamship was at approximately 6:40 o'clock on the afternoon of September the 26th.

The steamship admits liability for convoying, docking, and standing by, aggregating $412.50, but denies liability for salvage.

Denial of liability for salvage is upon several grounds: That the vessel was in no danger; that the captain knew where he was, had his charts, and would have brought the vessel into harbor had there been no warning; that the services rendered by the tug in giving the warning were gratuitous, and there was no expectation on the part of the captain of the tug that any salvage service had been earned; that the tug forced itself upon the steamship; that the tug gave direction to proceed toward the Nordlys, which was a mile beyond the sea buoy, and thus three miles further out than was necessary, because there was ample water for the vessel to go into the mouth of the river at any point between the sea buoy and the next buoy toward the land—two miles apart.

[1] 1. No claim for salvage is made except for the warning given the South American to change her course. There is a consensus of opinion that, had the course been continued, the vessel would have been stranded about four miles from land; that it would have been ultimately a complete wreck, and the lives of the crew would almost certainly have been lost, it being admitted that it would have been difficult, if not impossible, to have launched lifeboats from the steamship. There is some testimony that the captain of the steamship said to the captain of the tug, when approaching the wharf at Savannah, that he (the captain of the steamship) knew that he did not have much further to go when the warning from the tug captain came, and "I did not care a lot," and that the chief engineer of the steamship said that the "beaching" of the South American was contemplated, the making of which statements is strenuously denied. A decision as to these conflicts is unnecessary. There can be no question but that the vessel was in danger of being capsized, sufficiently so at least to make it imperative that the stern be kept to the wind and waves as much as practicable, in addition to the danger of running on the shoals. If the captain of the steamship knew as much about the approach to, and entrance into, the Savannah river as is claimed, why, in the first place, did he have his vessel four miles or more north of the entrance to the river? His explanation in part is that he expected a current in one direction and found it the reverse. In the

second place, would it not have been much safer, if he knew all of the facts, for him to take a course from the buoy off Gaskins bank directly to the sea buoy, whereby the exposure of the listed port side to the wind and waves would not be much greater than when on the course toward the north channel, rather than to take course to the north channel and go thence several miles to the sea buoy, when during the latter course the listed port side of his vessel would be almost, if not quite, at right angles to the wind and waves, and thus put the vessel in greater peril? It must be remembered that, if the contention of the captain of the vessel be correct to the effect that he had no intention of attempting to go through the north channel, knowing exactly where he was, and that he had a mile and a half further to go before striking shoal water, the further he went toward the north channel the greater length of time would be the exposure of his vessel in going from its turning point to the sea buoy. It is undenied that the waters were just as rough in the course that he would take from the north channel to the sea buoy as at other places in his course. It is further claimed that he knew that he could enter the mouth of the Savannah river at any point between the sea buoy and the next buoy, a distance of about two miles; yet he traversed of his own motion the full two miles, going beyond the sea buoy, with his vessel always exposed to the northeast wind and waves, instead of turning into the river mouth before reaching the sea buoy. It seems inevitable that he did not know as much as he now claims, or that his seamanship was wholly bad. An accentuation of the view that he did not have so definite knowledge as he now claims is the admitted fact that as soon as he received the warning he immediately turned his vessel, and this in the face of the fact that it is claimed further that, not only did he have his charts but that he was taking soundings; and further that only a short while before the approach of the tug, at 5 o'clock, he sent a radio message saying he needed tug assistance.

It is urged that to find against the vessel will stamp her captain as being incompetent, and thereby permanently injure him in his position which he has attained after great efforts. On the other hand, it must not be forgotton that the charge is made against the captain of the tugboat that he not only officiously intermeddled, but actually that he was guilty of fraudulent practices in order to establish a case of libel. The results of

the pronouncement of what is believed to be the truth must not influence a court in so doing. It is ever regrettable that there should be a direct conflict of testimony, and also regrettable that, even in the absence of conflict, denial of knowledge should be made when such knowledge is claimed.

The issues in this case have been voluminously and ably treated by proctors for both sides. I am of the opinion, and so find, that, had not the warning been given by the tug to the steamship to change its course, the vessel would have proceeded on toward the north channel until it reached shallow water, and that total wreckage of the vessel would have resulted.

2. The services thus rendered constitute salvage.

"Salvage services are of varied character, and may consist of saving a vessel or cargo in danger, supplying stores, lowering an anchor, going for assistance, towing, helping to navigate in a storm, piloting into port. * * * " Benedict on Admiralty (5th Ed.) vol. 1, § 117.

"Useful service of any kind," rendered "to a vessel exposed to any impending danger and imminent peril of loss or damage, * * * entitles those rendering it to salvage." The Pleasure Bay (D. C.) 226 F. 55.

Libelee urges that, if any salvage is to be allowed, the rule governing in this (the Fifth) circuit is "where a salved vessel was in danger only from possible, but undisclosed, perils of the sea, the allowance in this circuit to a salvaging tug usually has been fixed at double the towage rate," citing and quoting from The City of Portland (C. C. A.) 298 F. 27; The Catalina, 105 F. 633; The Jean L. Somerville (C. C. A.) 286 F. 35; Magnolia Petroleum Co. v. National Oil Transport Co. (C. C. A.) 286 F. 40; Holbrook v. Freeport Sulphur Transp. Co. (C. C. A.) 300 F. 63. An examination of these cases discloses that they were either cases in which the salved vessel was or had been in tow of the tug or that the services rendered were of such character as to really amount to hardly more than a towage.

[2] By stipulation, the value of the South American at Savannah was $55,824.60, and of the cargo $83,372.68. The freight collected from Cuba to New Jersey was $11,-604.30, of which approximately two-thirds had been earned. The value of the tug was about $60,000. The time it was engaged in this enterprise was something less than 24 hours. The danger to the tug was not great, though not entirely absent. The charges by

libelee that the tug officiously intermeddled and that its captain was guilty of fraudulent practices in order to establish a case of libel are unfounded.

Giving consideration to all of these elements, it is the opinion of the court that libelant should recover the sum of $5,000, covering convoying, docking, standing by, and salvage. Let a decree be entered accordingly.